FILED

**United States District Court
Northern District of Alabama
Western Division**

99 JUL 21 PM 2: 58

U.S. DISTRICT COURT
N.D. OF ALABAMA

Carl Daniel,                    ]

     Plaintiff(s),       ]

     vs.                 ]    CV-96-N-1213-W

**JVC Disc America Company,**  ]

     Defendant(s).    ]

ENTERED

JUL 21 1999

### Memorandum of Opinion

#### I. Introduction.

The plaintiff, Carl Daniel, charges his former employer, JVC Disc America Company ("JVC"), with discharging him because of his race, with discriminating against him in discipline, and with creating a racially hostile work environment in violation of rights afforded him under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* Specifically, the plaintiff alleges that the defendant discriminated against him based upon his race by discharging him from his employment for conduct for which it neither disciplined nor discharged white employees and by requiring him to work in a racially hostile environment.

The case is presently before the court on JVC's motion for summary judgment, filed on July 2, 1998.[1] Upon due consideration, the motion will be granted on all claims and the action will be dismissed.

---

[1] This case until recently was assigned to another judge of this court.

4 8

## II. Procedural Background.

This action was initiated on May 8, 1996, when the plaintiff filed a pro se application for

leave to file and proceed *in forma pauperis* and for the appointment of counsel. In his

application, Mr. Daniel declared under penalty of perjury:

JVC fired me because of an article in the newspaper. I am aware of more than one
employee about whom a [sic] article appeared in the newspaper.

\*        \*        \*        \*

There were [sic] an article in the newspaper about some other white employees and
they were not fired.

In his EEOC charge, filed on February 15, 1994, and attached to the application filed in this

court, Mr. Daniel stated:

I was discharged from the position of matrix plating inspector on November 3, 1993.
I was employed as a molding operator on February 23, 1987.

I was advised that I was discharged due to an article in the newspaper which
indicated that I had been arrested. I was not available for work for only one (1) day
due to my arrest. I have not been convicted of anything. I am aware of a White
employee about whom an article appeared in the newspaper concerning his arrest.
He was not fired or suspended.

I have been active in trying to organize a union, and I have spoken out and given a
deposition concerning discriminatory employment practices.

I believe that I have been discriminated against because of my race, Black, and in
retaliation for opposing practices that I believe are unlawful under Title VII.

By order entered on May 8, 1996, Judge Robert Propst of this court allowed Mr. Daniel to

file his action *in forma pauperis*, directed a magistrate judge to appoint counsel to

represent him, and directed that the application be treated as a complaint under Rule 8,

Federal Rules of Civil Procedure. The order provided, "[A]n amended complaint,

2

complying with the Federal Rules of Civil Procedure . . . and suitable for service on the defendants named therein . . . shall be filed with the court within 30 days from the date hereof . . . failing which this cause shall be dismissed for want of prosecution."

On September 24, 1996, attorneys Jeffrey W. Bennitt and Robyn Bufford entered their appearance in the action on behalf of the plaintiff, and, on September 25, 1996, Magistrate Judge Greene entered an order finding the request for the appointment of counsel moot. An amended complaint was filed by Bennitt and Bufford on September 27, 1996. In this amended complaint, Daniel's attorneys stated four claims: (1) Daniel was discharged because of his race; (2) he was discharged in retaliation for his deposition testimony in another case against JVC; (3) JVC refused to promote him because of his race; and (4)he was subjected to racial harassment. By order entered on October 24, 1996, Judge U. W. Clemon, the judge to whom this action was previously assigned, granted JVC's motion to dismiss all the plaintiff's claims under 42 U.S.C. § 1981 as having been brought outside the applicable limitations period, and, in a subsequent order, declined to allow an amendment to add claims under Section 1981.

A pretrial order was entered by Judge Clemon on March 19, 1998. The plaintiff's claims, as stated in the pretrial order, now binding on the parties, are that the plaintiff was denied promotions for which he was qualified because of his race; he was subjected to a racially hostile work environment; and JVC discriminated against him on the basis of his race when he was discharged on grounds for which white employees were not discharged.

As noted above, the defendant's motion for summary judgment was filed on July 2, 1998. Plaintiff's response was filed on July 22, 1998, and Defendant's reply on August 7, 1998. On

3

September 1, 1998, the plaintiff's attorneys were allowed to withdraw upon their representation that they feared the plaintiff would testify falsely in this case. The matter was reassigned to this judge on December 3, 1998.

## III.   The Undisputed Facts.[2]

### A.   The Termination Claim.

Carl Daniel began working for JVC in 1987 as a molding operator. (Daniel 49; Daniel Exh. 5). At 12:06 a.m. on October 31, 1993, Pickens County, Alabama sheriff deputies stopped Daniel for a traffic violation. A search of his car revealed the presence of $13,000.00 worth of cocaine and about $5,000.00 in cash. (Daniel 8-10; 38-39)[3] Accordingly, Pickens County law enforcement officials charged Daniel with trafficking crack cocaine, a Class A Felony under Alabama law. (Daniel 8-9; Exh. 1). Two years later Daniel reached a plea agreement with law enforcement officials, entered a plea of guilty, and was placed on probation. (Daniel 19; 35-36; Exh. 3; 4). After Daniel's arrest and charge was reported in an article in *The Tuscaloosa News,* (Daniel Exh. 33) and Daniel failed to appear for work, William G. Rush, JVC's Human Resources Manager, (Rush ¶ 4; Hamner 28-30) telephoned the Pickens County Sheriff's Department and spoke with an official who verified that Daniel had been arrested for possession of a large amount of crack cocaine valued at

---

[2] The facts set out herein are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record and the file in this matter. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund,* 17 F.3d 1386, 1400 (11th Cir. 1994), *cert. denied,* 513 U.S. 1110 (1995).

[3] Deposition testimony is cited as "(deponent's name - page.)." Declaration or affidavit testimony is cited as "declarant's name - ¶ no.)."

4

approximately $13,000.00, as well as $5,000.00 in cash.[4] (Rush ¶ 4; Hamner 30). The Pickens County official firmly stated there was no question regarding Daniel's guilt. (Rush ¶ 4). Rush reported this information to Charles Hartley who was then general manager of the defendant's Tuscaloosa facility. Based upon the newspaper article and the information they had received from the Pickens County Sheriff's Department, Rush and Hartley believed that Daniel had violated JVC's drug free policy. (Rush ¶¶ 4; 6; Hartley ¶¶ 4-5; Hamner 8). Under JVC's policy, employees are prohibited from using controlled substances at work or distributing controlled substances at any time or place. (Daniel Exh. 30; Hamner 8).[5] JVC

_____

[4] The plaintiff testified in deposition that he had borrowed $8,000 in cash from the West Alabama Bank approximately two weeks before his arrest to finance a remodeling project at his home. (Daniel 39). He further testified that he did not deposit the proceeds of the loan, but instead kept it on his person. (Daniel 40-41). He claims that he used the cash to pay his workers because they would not accept checks. (Daniel 41).

[5] Exhibit 30 to Mr. Daniel's deposition is a copy of JVC's drug free policy. It reads:

JVC is committed to a drug-free work place. Alcohol and drug abuse have an adverse effect on job performance, create dangerous situations, and serve to undermine our customers' and the community's confidence in JVC. The management of JVC is vitally concerned about the safety and well-being of all employees as well as with JVC's hard earned reputation and positive image.

JVC cannot and does not condone alcohol abuse in the workplace or drug abuse on the part of its employees, nor does it condone any employee behavior that may serve to damage the company's reputation. The consumption of alcohol during working hours and the use or distribution of illegal drugs is strictly prohibited. Employees must not report to work under the influence of drugs or alcohol.

An Employee Assistance Program (EAP) is available to any JVC member who is struggling with a substance abuse problem. Employees will not be terminated for voluntarily seeking assistance for problems with substance abuse; however, ongoing problems with performance, attendants [sic], or behavior may result in termination. Employees enrolled in treatment programs will be required to submit to random drug testing for a period lasting two (2) years beyond successful completion of a treatment program. Failure to pass a random test will result in termination.

Moreover, JVC's policy provides that any employee may be terminated for engaging in any "illegal acts." (Daniel Exh. 40.)

employees who violate the company's drug free policy are subject to immediate termination. (Hamner 8-9; 76-78).

On November 9, 1993, Mr. Hartley sent the plaintiff a letter in which he explained that he was being terminated because of the arrest in Pickens County and the facts unearthed by Rush during his investigation, including the possession of crack cocaine worth approximately $13,000. (Daniel Exh. 22; Hartley ¶5).

The plaintiff believes that JVC terminated his employment because of his race (Daniel 90), suggesting that JVC "planted" the crack cocaine in his automobile as a part of a conspiracy to discriminate against him on the basis of his race. (Daniel Exh. 33). The plaintiff is unable to identify any other JVC employee who was involved in the trafficking of controlled substances and who was not thereafter terminated. Instead, Daniel identifies a number of other employees who were allegedly involved in similar conduct but who were treated differently.

He claims that Jody Willmon was charged in a shooting incident but was neither fired nor otherwise disciplined. In his deposition, Mr. Daniel testified, "Well, there was an article in the paper about a guy murdered a person. I don't think that's much different in trafficking and murder, not much different." (Daniel 261). Mr. Hamner testified in deposition that he had reviewed the Willmon incident and the incident was "classified an accidental shooting." (Hamner 41). He further stated "[M]y understanding of the situation was that he was asked to take a leave of absence, but he didn't want to do that because he felt like work would be better for him, to get back into a regular routine. And an investigation was done, it's my understanding, and they talked with the Detective and the

6

Detective said that it was an accidental shooting and would probably classify that as a misdemeanor." (*Id.* at 42-43).

Daniel also identified Lonnie Sparks as one who had committed offenses but had not been disciplined by JVC. He stated, "I recall about Lonnie Sparks. It was an assault and rape charge, his fiancee or live-in roommate. I remember seeing the article, but he wasn't fired or anything. I don't know what was the outcome on his conviction." (Daniel 263). About this matter Buster Hamner testified that Sparks' fiancee had accused him of rape. He also stated, "it was investigated and charges were dropped. There were never no [sic] charges filed against him. It was dropped, is my understanding." (Hamner 40). He also testified, "[t]he fiancee's parents posted his bail the next day, and the charges were dropped, and nothing ever came of it. There was no charge." (*Id.* at 41).

Daniel points to Deborah Mouser and claims that she shot and killed her husband. Specifically, he testified "I know there was a shooting. Deborah Mouser shot and killed her husband, but I don't know. That was in another county. It was over there I think in Pickens County if I'm not mistaken, but I don't know the outcome. I don't recall the article. I don't know if an article came out or not." (Daniel 264). Mr. Hamner testified about the Mouser situation:

Q.     What about Deborah – Deborah Mouser? Are you familiar with her situation, where she allegedly shot and killed her husband?

A.     I've heard that.

Q.     Did you read her file before –

A.     Yes,

7

Q.    Is there anything in the file about that?

A.    No.

Q.    Did you investigate and talk to any of the Managers about it?

A.    I did.

Q.    And what did they tell you?

A.    They said that that was a rumor; that that had been rumored that that
      had taken place. But their understanding was that was way prior to
      her employment with J. V. C.

Q.    So I take it Ms. Mouser was not charged by the County or State.

A.    I have no knowledge. Like I said, it was –

Q.    And if she was, it would have been in her employment application?

A.    I'm sure that if that had happened, it did not happen while Deborah
      Mouser was an employee of J. V. C. It was prior to her employment.

(Hamner 43-44).

Daniel stated that John McLaughlin "had a DUI" and was neither fired nor otherwise

disciplined. He had no knowledge whether the McLaughlin incident was reported in the

media or even whether JVC officials were aware it. (Daniel 266-267).

Finally, Daniel claims that Craig Kilgore had told him that he (Kilgore) had failed a drug

test. (Daniel 267). About Mr. Kilgore, Mr. Hamner stated, "Again, he took this drug screen

and was not offered a job at the time because he failed it. And he eventually was hired.

I did not know the circumstances regarding his eventual employment." (Hamner 33).

8

## B. Claims of Race-Based Disciplinary Proceedings.

The plaintiff also claims that JVC subjected him to disciplinary proceedings on a number of occasions.

During 1989 Rhonda Lunceford, who was then Daniel's supervisor, complained that Daniel had sexually harassed her. Ms. Lunceford complained that on Sept. 2, 1989, Daniel made verbal comments and gestures which she construed to be sexual in nature. She reported that on October 2, 1989, he stated to her, "[T]hat if I wasn't his boss lady he'd tell me what he'd like to do to me." She also reported that on October 31, 1989, he had touched her hair and said, "He'd sure like to run his fingers through all that hair." Following that report, Daniel was counseled and given a counseling statement which provided: "This document will serve as a final warning for Carl Daniel, that if there is another incident of this nature or a related nature we will have no other alternative but to terminate Carl Daniel's employment with JVC Disc American Co." (Daniel Exh. 23).

On Jan. 18, 1990, Daniel was suspended by JVC based upon unsatisfactory work performance (Daniel Exh. 24)[9] and for being absent from his workplace without

---

[9] In pertinent part the counseling statement received by Daniel on that date read:

It has come to our attention that on the day of Wednesday, January 17, 1990, 1100 NG discs were produced. These discs were produced on machine # 3 and were checked and approved 2 times by Carl Daniel. These discs were later judged NG by the inspection 1 operator and NG'd by the department supervisor. The discs had very large NG stains. The stains were very visible on substrate discs and sputtered discs. Carl has been counselled previously about producing NG discs.

Also on January 12, Carl was found out of his department which was unauthorized by his supervisor and group leader. Carl has been counselled on this matter numerous times prior to this incident. We feel that these incidents could be directly related to his production of NG discs. Due to the fact that Carl has been counselled on numerous occations [sic] and there has been no visible improvement on his job performance, therefore we have no choice but to suspend Carl effective on 1-18-90. This suspension will include today's date, 1-22-90 and 1-23-

9

permission. Daniel claims that others also produced NG discs but they were not disciplined. (Daniel 315). He could not identify any of the persons who produced such discs and were not disciplined. (Daniel 316).

On or about February 20, 1992, Daniel was reprimanded after he was found in a department other than his own at the JVC plant. (Daniel 319-320; Exh. 26). Daniel claimed other employees had committed similar offenses but had not been disciplined. (Daniel 321).

On or about March 3, 1993, Daniel was reprimanded for using the telephone that was connected to the facsimile machine to make personal telephone calls without permission. (Daniel 322-323; Exh. 27). While claiming that other employees committed similar offenses without being disciplined, Daniel was unable to identify any such employees. (Daniel 325-326). With regard to the allegations of discriminatory discipline, Daniel did not file any charge of discrimination with the Equal Employment Opportunity Commission. (Daniel's Summary Judgment Resp. Exh. 23).

## C. The Promotion Claims.

Daniel bases his claims of "failure to promote" on ten positions which were filled between April 20, 1988, and September 24, 1990. They are: matrix operator April 20, 1988; molding shift leader June 30, 1988; molding maintenance technician Aug. 8, 1988; molding group leader Aug. 8, 1988; matrix operator October 6, 1989; molding group leader Sept. 4,

90.

We hope Carl will consider his future with JVC during this time off. Carl will be required to report for work on 1-26-90 at 6:30 a.m. At that time Carl will need to communicate with his supervisor as to whether he wishes to stay employed with JVC Disk American Company.

10

1989; molding maintenance technician October 6, 1989; matrix editor Sept. 23, 1990; model line system September 24, 1990; and cutting operator September 24, 1990.

### D. Racially Hostile Work Environment Claim.

Mr. Daniel claims that he was subjected by his employer to a racially hostile work environment based upon events which occurred between 1987 and 1993.

He testified in his deposition that when he was hired in February 1987 he saw Ku Klux Klan posters on the wall of the main hallway of the plant, and they remained there for about one week. (Daniel 156). He described them as sheets of paper that were eight and one-half by eleven inches, containing nothing but "KKK" written in black ink. (Daniel 159). He admitted that he never said anything to anyone about the posters until he gave his deposition in this case. (Daniel 160). He explained, "Well, like I said, I'm outspoken far as black people is [sic] concerned. And then, when I was hired, I'm one of the first blacks that was hired. So, in the cleaning room department, I can't recall any black when I first started that was working beside me immediately. I can't recall. Peggy Thomas was working but she was on a whole different shift. And I can't recall any of the other blacks that was [sic] down there." (Daniel 160-161).

The plaintiff next testified that JVC created a racially hostile work environment when it did not give free tickets to the motion picture "Malcolm X." (Daniel 170-175).

The plaintiff complains that in 1992 an unknown employee placed a suggestion in JVC's suggestion box asking why "JVC did not promote black employees." He testified in his deposition that JVC posted a response that "basically" said that "black people were not

11

dependable and not educated enough to be in management." (Daniel 135-136). Testifying about the same incident in another case in 1992, Daniel stated:

> Q. Someone had asked why aren't there any black supervisors?
>
> A. Right. And the answers that JVC gave was we don't hire- we don't hire according to race, color or belief, something like that. We hire them according to dependability, education and some other.
>
> Q. Okay. In your view that wasn't a proper answer?
>
> A. Right.

(Daniel (1992) 49).

Mr. Daniel claims that during 1988 he found a paper napkin shaped like a KKK hood in his work locker. (Daniel 114-115; Exh. 15). He also testified that he continued to receive such items approximately once a month until late in 1991. (Daniel 117). Daniel does not know who left the hoods nor does he know any other JVC employee who found any similar items. (Daniel 118-119; 154). He stated that he had reported the receipt of these items to a number of JVC supervisors: Mark Cole; Jeff Gillam; Keith Gamble; Robert Morris; Charles Hartley; Bill Rush; and two Japanese managers. (Daniel 122). He also stated that he last received a Klan related item in approximately 1992. (Daniel 122). When he testified about the same item in the 1992 deposition, Daniel stated he did not give any of the items to any JVC supervisor or manager but, instead, kept them in his locker. (Daniel (1992) 26). When asked about those items in the 1992 deposition, Mr. Daniel stated that he had "mentioned" them to Robert Morris once in 1991. (Daniel (1992) 122). He also stated he never received any Klan item after complaining to Morris in 1991 and had never complained about them again. (Daniel (1992) 122-123).

Finally, Daniel alleges that four JVC supervisors or managers made racially offensive remarks in 1988, 1991, 1992 and 1993. The last of these was in August 1993. Specifically, he says:

(1) In 1988, Mark Cole, Daniel's then supervisor, told Daniel that he acted like a "scared nigger." (Daniel 151). He never heard Cole use any racially offensive language on any other occasion. (Daniel 153).

(2) In 1991, Daniel heard his then supervisor Donna Wiggins say, "we gave you people a job and now you're trying to take over." (Daniel 163). The plaintiff assumed that Wiggins was referring to black persons. (Daniel 165-66). Wiggins never made any other racial remark in his presence. (Daniel 165-66).

(3) Next, Daniel claims that in late 1992 he heard a "rumor" that Charles Hartley had said at a meeting that "he had promoted all the niggers he was going to promote." (Daniel 139). The plaintiff was not present. He heard the rumor from Clarissa Hood, a co-worker, who allegedly heard it from Dorothy Gaitor, another co-worker, who allegedly heard it from Keith Gamble, a supervisor who was allegedly at the meeting. (Daniel 139-40; 337).

(4) Daniel claims that sometime in August 1993, Keith Gamble, his then supervisor told him that he should not worry about "racial activities" in his department because it "ha[d] more niggers than any other department throughout the plant." (Daniel 123). The plaintiff never heard Gamble use racially offensive language on any other occasion. (Daniel 153).

## IV.   Summary Judgment Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with

13

the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Where the nonmoving party will bear the burden of proof at trial, there is no requirement, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Celotex*, 477 U.S. at 318. "Instead, the moving party simply may '"show[ ]"'--that is, point[ ] out to the district court--that there is an absence of evidence to support the nonmoving party's case.'" *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437-38 (11th Cir. 1991) (*en banc*) (quoting *Celotex*, 477 U.S. at 324); *see also Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (same); *Young v. City of Augusta*, 59 F.3d 1160, 1170 (11th Cir. 1995). However, "it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Clark v. Coats and Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). The moving party must instead make an "affirmative showing" that crucial evidence is missing "by reference to any combination of the following: pleadings; deposition testimony of a party or its witness; affidavits; responses to interrogatories . . . ; requests for admission . . . ; and any other exchanges between the parties that are in the record." *Cheatwood v. Roanoke Indus.*, 891 F. Supp. 1528, 1533 (N.D. Ala. 1995).

14

"Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial. (citations omitted). If the moving party shows the absence of a triable issue of fact by either method, the burden on summary judgment shifts to the nonmoving party, who must show that a genuine issue remains for trial." *Four Parcels of Real Property*, 941 F.2d at 1437-38 (11th Cir. 1991).

At this stage, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, she may not merely rest on her pleadings. *Id.* at 324. The nonmoving party must make a specific, affirmative showing that a genuine factual dispute exists. If the required showing is not made, "summary judgment, if appropriate, shall be entered against the adverse party." Fed. R. Civ. P. 56(e). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

After the plaintiff has responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*,

15

477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. The "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11 (1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

16

## V. Discussion.

### A. Controlling Principles.

The plaintiff contends that JVC discriminated against him on the basis of race when it terminated his employment on November 9, 1993. A plaintiff who alleges disparate treatment based upon race under Title VII must prove that the defendant acted with discriminatory purpose. *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984). The plaintiff can create a rebuttable presumption of discriminatory intent by establishing a prima facie case. *Young v. General Foods Corp.*, 840 F.2d 825, 828 (11th Cir. 1988), *cert. denied*, 488 U.S. 1004 (1989). This may be done in three ways: (1) "by presenting direct evidence of discriminatory intent; [(2)] by meeting the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); or [(3)] by demonstrating through statistics a pattern of discrimination." *Early v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990).

### 1. Direct or Statistical Evidence.

"Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact without inference or presumption." *Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989) (citations omitted). "[O]nly the most blatant remarks, whose intent could be nothing other than to discriminate . . . constitute direct evidence of discrimination." *Id.* at 582 (footnote omitted).[7] A second means by which Daniel may

---

[7]Daniel has produced no direct evidence of race discrimination. Although he claims that on four occasions between 1988 and 1993 three different JVC employees who were in supervisory positions used the word "nigger" (Daniel 139-140; 151-153), such stray, isolated remarks, even if made, do not constitute direct evidence of racial discrimination. *See Trotter v. Board of Trustees*, 91 F.3d 1449, 1453-54 (11th Cir. 1996). Moreover, these alleged remarks were not made in connection with Daniel's termination (or any other adverse employment action

17

establish a prima facie case is by presenting statistical evidence that demonstrates a pattern and practice of race discrimination on the part of BellSouth. *See Early v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (age discrimination case). The plaintiff has presented no direct evidence or statistical data; therefore, if he is to establish a prima facie case of discrimination, he must do so by the traditional *McDonnell Douglas* circumstantial evidence method.

## 2. *McDonnell Douglas* Test.

Where a discrimination claim is based on circumstantial evidence, the court employs the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, the plaintiff has the burden of establishing a prima facie case of discrimination.[8] "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). The burden of production then shifts to the defendant, requiring it to articulate some "legitimate, nondiscriminatory reason" for the alleged discriminatory employment action. *Id.* "'[I]t is possible for the defendant to present such strong evidence of a nondiscriminatory rationale that summary judgment is

---

for that matter) and simply do not rise to the level necessary under Eleventh Circuit standards to constitute direct evidence that JVC terminated, disciplined or failed to promote Daniel because of his race. *See Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990) (holding that direct evidence must correlate to the discrimination of which plaintiff complains); *Early v. Champion Int'l Co.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (limiting direct evidence to only the most blatant remarks, whose intent could be nothing other than to discriminate).

[8] Under this test, the elements of a prima facie case may be modified to fit the circumstances. "The *McDonnell Douglas-Burdine* proof structure 'was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'" *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 594 (11th Cir. 1987) (quoting *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)).

18

warranted.'" *Brown v. American Honda Motor Co.*, 939 F.2d 946, 950 (11th Cir. 1991), *cert. denied*, 502 U.S. 1058 (1992) (quoting *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 596 (11th Cir. 1987)).

Once the defendant presents a legitimate, nondiscriminatory reason for its action, the presumption of discrimination "drops from the case." *Burdine*, 450 U.S. at 255 & n.10. The plaintiff must then demonstrate by a preponderance of the evidence that the reason offered by the defendant was not the true reason for the employment decision, but rather is a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804. "'[B]ecause the plaintiff bears the burden of establishing pretext [for discrimination], he must present 'significantly probative' evidence on the issue to avoid summary judgment." *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 444 (11th Cir. 1996) *cert. denied*, 521 U.S. 1119 (11th Cir. 1997)(quoting *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988), *cert. denied*, 488 U.S. 1004 (1989)) (other citations omitted) (alterations in original). The plaintiff may establish that the defendant intentionally discriminated against him "'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989) (quoting *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1445 (11th Cir.), *cert. denied*, 474 U.S. 1005 (1985)). "'Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [a defendant] has offered extensive evidence of legitimate, non-discriminatory reasons for its actions.'" *Isenbergh*, 97 F.3d at 444 (quoting *Young*, 840 F.2d at 830). If a plaintiff succeeds in this burden, the "disbelief

of the defendant's proffered reasons, together with the prima facie case, is sufficient circumstantial evidence to support a finding of discrimination" and to preclude summary judgment. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997).

To establish a prima facie case of discrimination under the instant circumstances, Daniel must demonstrate that (1) he is a member of a protected class; and either (2) he did not violate a company rule; or (2) he engaged in misconduct similar to that of a person outside the protected class and (3) the disciplinary measures enforced against him were more severe than those enforced against the other persons engaged in similar misconduct. *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989).

### B. The Termination Claim.

First, Daniel denies that he violated JVC's drug-free environment policy, arguing that he did not possess or use drugs in the work place; that he was not guilty of the offense for which he was discharged; and finally that white employees who had committed similar acts were not terminated.[9]

Daniel is a black man who was terminated after he was arrested and charged with trafficking in cocaine. Even so, he fails to establish a *prima facie* case of disparate treatment in connection with that termination because he cannot produce evidence to

---

[9] The defendant asserts that all the plaintiff's claims should fail because he did not file suit within 90 days of the date he received a right-to-sue letter from the EEOC citing *Baldwin County Welcome Center v. Brown*, 466 U.S. 147, 149 (1984), JVC argues that the mere filing of a request for the appointment of counsel and a copy of the right-to-sue letter is not sufficient to meet the timely filing requirement. At least insofar as the termination claim is concerned, however, this argument is unavailing. In his filing of May 8, 1996, the plaintiff included a short and plain statement of the matter about which he was complaining. "JVC fired me because of an article in the newspaper. I am aware of more than one employee about whom a [sic] article appeared in the newspaper." Moreover, Judge Propst chose to treat the application as a complaint and allowed Daniel an opportunity to amend to more fully state his claims.

20

create a genuine issue of material fact on the question of whether he was treated differently than were similarly situated white employees.

First, with regard to his claim that he was not guilty of the criminal charge, the record is clear that he entered a plea of guilty to a drug-related offense that was founded upon the incident that was reported in the local Tuscaloosa newspaper. He can hardly claim now that he was not guilty. Moreover, JVC officials conducted a reasonable investigation of the reported incident by speaking to an official at the Pickens County Sheriff's Department who verified that Daniel, in fact, had been arrested in possession of a large amount of crack cocaine that was valued at approximately $13,000.00, as well as $5,000.00 in cash. "The law is clear that, even if a Title VII claimant did not in fact commit the violation with which he is charged, an employer successfully rebuts any prima facie case of disparate treatment by showing that it honestly believed the employee committed the violation." *Id.* Daniel points to no evidence that would call into question the honest belief of JVC managers that he was guilty of trafficking in crack cocaine on the occasion of his arrest in Pickens County, Alabama.

Next, Daniel argues that white employees committed similar offenses and were not terminated. In order to create a genuine issue of material fact on this point, the plaintiff must point to evidence of similarly situated employees. He can satisfy this part of his *prima facie* case if:

[T]he plaintiffs must show that he and the employees are similarly situated in all relevant respects. . . . [citations omitted]. In determining whether employees are similarly situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.

21

*Holifield v. Reno*, 115 F.3d 1555, 1561-62 (11th Cir. 1997). The most important factors "'in the disciplinary context . . . are the nature of the offenses committed and the nature of the punishments imposed.'" *Jones v. Gerwens*, 874 F.2d 1534, 1539-40 (11th Cir. 1989) (*quoting Moore v. City of Charlotte*, 754 F.2d 1100, 1105 (4th Cir. 1985) *cert. denied*, 472 U.S. 1021 (4th Cir. 1985)); *see Holifield*, 115 F.3d at 1562; *see also Wilmington v. J.I. Case Co.*, 793 F.2d 909, 916 (8th Cir. 1986); *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984). A plaintiff who does not identify similarly situated employees from outside his protected group who misbehaved in a similar fashion but who were treated more favorably fails because the burden is on him to establish a prima facie case. *See McDonnell Douglas*, 411 U.S. at 802; *Jones*, 874 F.2d at 1541.

Daniel points to five white JVC employees who he believes were not disciplined after committing acts similar to his. First, he claims that Jody Willmon killed a man but was not terminated. The evidence of record is that officials of the defendant reviewed the incident and found that law enforcement officers had "classified [it as] an accidental shooting." Mr. Hamner testified, and the plaintiff has not called the court's attention to contrary evidence, that "an investigation was done, it's my understanding, and they talked with the detective and the detective said that it was an accidental shooting and would probably classify that as a misdemeanor." (Hamner 42-43).

According to the plaintiff, Lonnie Sparks assaulted and raped "his fiancee or live-in roommate . . . but he wasn't fired or anything." (Daniel 263). Mr. Hamner testified, "It was investigated and charges were dropped. There were never no [sic] charges filed against him. It was dropped, is my understanding." (Hamner 40).

22

Next Daniel claims that Deborah Mouser shot and killed her husband but was not terminated. On that matter, Mr. Hamner stated, "I'm sure that if that happened, it did not happen while Deborah Mouser was an employee of J. V. C. It was prior to her employment." (Hamner 43-44).

While claiming that John McLaughlin "had a DUI" and was neither fired nor otherwise disciplined, the plaintiff acknowledged that he had no evidence that JVC officials were aware of it. (Daniel 267).

Finally, Daniel claims that Craig Kilgore had told him that he (Kilgore) had failed a drug test. (Daniel 267). The evidence was that Kilgore was first denied employment because of a failed drug test and was hired on some later occasion.

It is the law of this circuit that "Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules." *Nix*, 738 F.2d at 1187. The defendant in this case was entitled to conclude that the offenses allegedly committed by Willmon, Sparks, Mouser, McLaughlin, and Kilgore were not as serious and did not reflect in a negative way on JVC as did the offense committed by Daniel. So long as such decisions are made in a nondiscriminatory way (and Daniel has pointed to no evidence that whites and blacks were treated differently), JVC has the right to make them as it chooses.[19]

_____

[19] The plaintiff's argument that his conduct did not violate JVC's drug-free workplace policy is frivolous. That policy provided that "JVC . . . does not condone . . . drug abuse on the part of its employees . . . and the use or distribution of illegal drugs is strictly prohibited." His contention that the policy applied only to conduct of employees while at work represents a tortured and unrealistic reading of that policy.

23

Even if the court should assume the presence of a *prima facie* case of disparate treatment, the termination claim still fails. That is for the reason that JVC has articulated a legitimate non-discriminatory reason for discharging Daniel, i.e., his arrest in Pickens County, Alabama, for trafficking in crack cocaine. *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1187 (11th Cir. 1984) (violation of work place rule constitutes legitimate non-discriminatory reason).

That being the case, Daniel could avoid summary judgment only by submitting sufficient evidence to demonstrate that JVC's articulated reason was a pretext for discrimination. *Grigsby*, 821 F.2d at 596-597 (11th Cir. 1989). He may not rely only upon his own conclusory allegations. *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1471-72 (11th Cir. 1991); *Carter v. City of Miami*, 870 F.2d 578, 585 (11th Cir. 1989); *Grigsby*, 821 F.2d at 597. Instead, he must come forward with concrete evidence sufficient to cast doubt on JVC's proffered reason such that a reasonable fact finder could conclude that the proffered reason did not actually motivate its decision to terminate him. *Combs v. Plantation Patterns*, 106 F.3d at 1538 (11th Cir. 1997); *Early v. Champion Int'l. Corp.*, 907 F.2d 1077, 1081, 1083-84 (11th Cir. 1990).

Daniel has offered no evidence that would support a rational trier of fact in finding that JVC's articulated reason was a pretext for discrimination. The termination claim is without merit. The defendant is entitled to summary judgment and dismissal of the claim.

24

## C. The Remaining Claims (Discipline, Promotion, and Harassment).

JVC asserts that all Daniel's remaining claims are barred, either because they were never made the subject of an EEOC charge or because they were brought outside the applicable time period. The court agrees.

The plaintiff complains of disciplinary proceedings against him in October 31, 1989; January 18, 1990; February 20, 1992; and March 3, 1993. He did not include any of these claims in the charge he filed with the EEOC. Daniel claims JVC discriminated against him when he was not promoted on ten occasions between April 20, 1988, and September 24, 1990. Finally, Daniel alleges that four JVC supervisors or managers made racially offensive remarks in 1988, 1991, 1992 and 1993. The last of these was in August 1993.

As noted above, JVC terminated the plaintiff on November 9, 1993. He filed his EEOC charge on February 15, 1994. In that charge, he made no claims concerning discipline, promotions, or racial harassment. Instead, the charge was limited to his termination.[11] The present law suit was filed on May 8, 1996, almost two and one-half years after he was terminated. None of these claims, other than termination, appeared in this lawsuit until September 27, 1996, almost three years after his termination and more than three years after the date on which the last of the events made the basis of any other claim occurred.

---

[11] Daniel did include language to suggest a claim for retaliation. He stated, "I believe that I have been discriminated against because of my race, Black, and in retaliation for opposing practices that I believe are unlawful under Title VII." The retaliation "claim" requires no discussion. Title VII provides no protection for one who is a victim of retaliation based upon union activities. Daniel has not argued that JVC retaliated against him because he reported the "KKK" materials to management and the court finds nothing in the record to suggest that his report and the termination were related in any way whatsoever. Furthermore, he suggests nothing to tie his 1992 deposition testimony in another case to the decision to terminate him. Finally, his arrest and cocaine trafficking charge form a sufficient basis to justify his termination.

25

Though the Court has found that Daniel's request for the appointment of counsel and his brief recitation of the termination claim was sufficient to preserve that claim against a statute-of-limitations defense, the same cannot be said for the remaining claims. In his application, he said nothing that even suggested he might have claims for discriminatory discipline, failure to promote, and racial harassment. In short, there is no sufficient allegation to constitute a complaint as to those claims under Fed. R. Civ. P. 8. *See Robinson v. City of Fairfield*, 750 F.2d 1507 (11th Cir. 1985). Daniel's failure to provide a "short plain statement of the facts" that support these three claims precludes him from litigating them now.

A Title VII plaintiff cannot bring claims that would not "reasonably be expected to grow out of the charge of discrimination." *Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988); *see also Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974); *Turner v. Orr*, 804 F.2d 1223, 1226 (11th Cir. 1986). The logic of this rule is explained by the Fifth Circuit as follows:

A charge of discrimination is not filed as a preliminary to a lawsuit. On the contrary, the purpose of a charge of discrimination is to trigger the investigatory and conciliatory procedures of the EEOC. Once a charge has been filed, the Commission carries out its investigatory function and attempts to obtain voluntary compliance with the law. Only if the EEOC fails to achieve voluntary compliance will the matter ever become the subject of court action. Thus it is obvious that the civil action is much more intimately related to the EEOC investigation than to the words of the charge which originally triggered the investigation. Within this statutory scheme, it is only logical to limit the permissible scope of the civil action to the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.

A more exacting rule would be destructive of the logic of the statutory scheme, for it would impede the ability of the Commission to effect voluntary compliance. If an alleged discriminator knew that a particular issue which was the subject of EEOC

26

conciliation efforts could never be the subject of a civil action, his incentive toward
voluntary compliance would be lessened.

*Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 466 (5th Cir. 1970).

In this case, Daniel included nothing in his EEOC charge that would alert either the

EEOC that it should investigate or JVC that it should be prepared to defend against any of

the claims asserted here except the termination claim.[12]

Even had he included these claims in his EEOC charge, they, with one possible

exception, would be time-barred.[13] Except for the claimed racial remark in August 1993,

every incident about which Daniel complains took place many months before his February

15, 1994, EEOC charge and even longer before his May 1996 civil action in this court. He

claims he saw "KKK posters" in 1987 (Daniel 156); received "KKK napkin hoods" from an

unknown source at various times between 1988 and 1991 (Daniel 110 - 115; (Daniel (1992)

121-122); failed to receive free tickets to "Malcolm X," a motion picture that was released

in 1992[14] (Daniel 170-75); saw what he interpreted as "racial remarks" on a company

bulletin board in 1992 (Daniel 135-36); heard three different supervisors make racial slurs

on three different, isolated, and unrelated occasions; and heard a rumor about another,

over a five-year period. (Daniel 139-40; 151-53; 165-66).

_____

[12] The inclusion of a claim that he had "a KKK hood posted" in his locker on a single occasion sometime
prior to December 1992 could hardly be expected to put anyone on notice that he would subsequently claim that
he was the victim of a racially hostile work environment.

[13] Title 29 U.S.C. § 626(d)(1) requires that a plaintiff file an EEOC charge within 180 days of the alleged
discriminatory act about which he complains. This requirement of a timely filed charge is a pre-condition to the
bringing of a civil action under Title VII. *See Increase Minority Participation by Affirmative Change Today
(IMPACT) v. Firestone,* 893 F.2d 1189, 1196 (11th Cir. 1990).

[14] For the year during which this movie was released, the court has relied on the representation of the
defendant. No reference to that date has been found in the evidentiary record. The date doesn't strike the court
as particularly important. The incident was not "objectively" discriminatory or harassing. *See Harris, infra.*

27

It is unclear whether the claimed racial slur of Keith Gamble, allegedly made in August 1993, (Daniel 123; 151-153) falls within the 180-day period before the EEOC charge was filed. Gamble's alleged comment would not, in and of itself, constitute a Title VII violation.[15/] This circuit has distinguished workplaces in which offensive terms are used infrequently in casual conversation from those where racially derogatory remarks are "commonplace, overt and denigrating." *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521-22 (11th Cir. 1995); *E.E.O.C. v. Beverage Canners, Inc.*, 897 F.2d 1067, 1070 (11th Cir. 1990). Isolated, infrequent comments such as Gamble's are not actionable under Title VII. *See Beverage Canners*, 897 F.2d at 1070 (stating that not all racial slurs rise to the level of a Title VII violation); *Johnson v. Bunny Bread Co.* 646 F.2d 1250, 1257 (8th Cir. 1981) ("[M]ore than a few isolated incidents of harassment must have occurred. Racial comments that are merely part of casual conversation, are accidental, or are sporadic do not trigger Title VII's sanctions."). Thus, to the extent Daniel predicates his racial harassment claim on Gamble's single alleged comment in August 1993, his claim fails.

The plaintiff, seeking to preserve his harassment claim, argues that the comment of Gamble, arguably within the limitations period, was but the latest in a continuing series of acts by JVC employees that will allow him to avoid summary judgment. The continuing violation theory, when applicable, has the effect of "reliev[ing] a plaintiff . . . from the burden of proving that the entire violation occurred within the actionable period." *Berry v. Board of Sup'rs of L.S.U.*, 715 F.2d 971, 979 (5th Cir. 1983). Federal courts have long

---

[15/]Daniel testified that he heard his then supervisor Keith Gamble say in August 1992 that the Matrix Department had, "more niggers than any other department in the plant." (Daniel 123; 152-53). He conceded he had never heard Gamble use any other racial slur. (*Id.*).

acknowledged that the filing of a timely EEOC charge is "a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans. World Airlines*, 455 U.S. 385, 393 (1982). One generally recognized exception to the filing requirement occurs where the conduct about which the plaintiff complains constitutes a "continuing violation." *See, e.g., Patterson v. Augat Wiring Sys., Inc.*, 944 F. Supp. 1509, 1517 (M.D. Ala. 1996) (*citing Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 449 (11th Cir. 1993)). Where the court finds a continuing violation, the plaintiff can "file a valid charge of discrimination based upon that illegal practice until 180 days after the last occurrence of an instance of that practice." *Beavers v. American Cast Iron Pipe Co.*, 975 F.2d 792, 796 (11th Cir. 1992). "[T]he timely discrimination alleged by the plaintiff cannot simply be a perpetuation of the effects of the past discriminatory acts." *Bush v. Liberty Nat'l Life Ins. Co.*, 12 F. Supp. 2d 1251, 1257 (M.D. Ala. 1998) (citations omitted).

To establish a continuing violation, the plaintiff must prove a series of related acts, one or more of which falls within the 180-day period. . . . *Id.* (quoting B. Schlei & P. Grossman, *Employment Discrimination Law*, 232 (Supp. 1979)). *See also Coon*, 829 F.2d at 1563; *Berry*, 715 F.2d at 981 (canvassing relevant factors to proving a continuing violation). *Mills v. Amoco Performance Products, Inc.*, 872 F. Supp. 975, 986 (S. D. Ga. 1994).

The *Berry* court has provided guidance to those district courts called upon to determine,

> [W]hen alleged discriminatory acts are related closely enough to constitute a continuing violation and when they are merely discrete, isolated, and completed acts which must be regarded as individual violations. *See Tarvesian v. Carr Division of TRW, Inc., supra,* 407 F. Supp. at 339-40; *Nelson v. Williams*, 1981 WL 27055, *2, 25 F.E.P. 1214, 1215 (D.D.C. 1981) ("In order to support a finding of a continuous

29

violation, [plaintiff] must do more than show a series of unrelated and isolated instances of discrimination. She must prove a series of continuous violations constituting an organized scheme leading to a present violation."). This inquiry, of necessity, turns on the facts and context of each particular case. Relevant to the determination are the following three factors, which we discuss, but by no means consider to be exhaustive. The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring (e.g., a biweekly paycheck) or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate? As noted, the particular context of individual employment situations requires a fact-specific inquiry by a trial judge which cannot be easily reduced to a formula. We feel, however, that consideration of the above factors will generally be appropriate, and we leave their application here, as well as whether trial on the merits is required for their resolution, in the first instance to the district court.

*Berry*, 715 F.2d at 981-82.

Mr. Daniel's claim that the defendant subjected him to a racially hostile work environment is focused on five different areas. He claims there were "KKK posters" in a company hallway at or about the time of his hiring in 1987 (Daniel 156). He also claims that he received "KKK napkin hoods" from an unknown source at various times between 1988 and 1991 (Daniel 110-15); (Daniel (1992) 121-22) and that in March 1992, three employees "came to my work area with a white cloth around their face with the eyes cut out. Peggy said to me that if they could get me fired, then they could get promoted." (Daniel Aff. ¶ 8). Next he complains that the defendant did not give its employees, black or white, free tickets to the movie "Malcolm X." (Daniel 170-75). He alleges he saw "racial remarks" on a company bulletin board in 1992 (Daniel 135-36). Finally, he claims that four different

30

supervisors used racial slurs on four different, isolated, and unrelated occasions in 1988,

1991, 1992 and 1993. (Daniel 139-40; 151-53; 165-66).

Though he did not testify about them at his deposition or refer to them in his own

affidavit, Daniel has attached affidavits from three former JVC employees about their

observations of racially offensive events at the workplace.[16]

---

[16]Jacqualynn Crawford stated:

    I was employed at JVC from July 1989 to September 1994. I personally witnessed a racially hostile environment at the plant where Carl Daniel worked. I heard many racial slurs, racial jokes, and comments during the years that I worked there. For example, one time there were blacks in a room and a group of white employees came in the room, and sarcastically asked what smelled in the room. There was nothing in the room. They were referring to us. I noticed that white supervisors treated the blacks more critically than the whites. I witnessed an occasion where we (a group of black employees) were in a group talking and laughing and a white supervisor, Robert Morris, told us to quiet when at the same time a group of white employees were also talking and laughing and he said nothing to them. I was accused of being a troublemaker by Robert Morris. He never specified what he was talking about. On another occasion, I was told by Robert Morris on the day I wore my hair in braids that I looked like Medussa. Robert Morris was a manager over myself and Carl Daniel. I believe that he was prejudiced. One day I told him that I had been called a nigger at the grocery store and that I was upset that in this day and time people still acted that way. He said, "Haven't you gotten used to that, yet."

    I reported how I felt to Mr. Taze [sic], who was over the plant. He said that he would check into it but nothing ever came of it and no one ever talked to me. I reported to Chuck Hartley in 1990-1991 and I told him how I felt about the racial atmosphere. He told me that they would start having blacks in management positions. Nothing changed. We had no blacks in management positions when I left in 1994. There wasn't even a black supervisor.

Another former employee, Lucy Emonina stated:

    I was employed at JVC from February 1987 to 1994. I witnessed first hand a racially hostile environment at the plant where Daniel worked. I heard verbal statements from the white employees. There was a young black lady who came to work with her hair braided and the white employees wanted to know if it was her real hair. She had to remove her braids. I heard white employees refered [sic] to black people as niggers in jokes and in speech. The N word was said, but not all the time. I saw white employees who violated company policy, like taking longer breaks than they were supposed to, and not get reported. But it seemed that black employees who made any mistakes were always reported or criticized. The white supervisors talked down to the black employees and held them in a different light than the white employees.

Finally, another former employee, Eric Jones, stated:

    I was employed by JVC from 1987 to July 1996. During the time that I worked there I witnessed a racially hostile environment in the plant. The supervisors were white and they appeared to treat the white co-employees better than the black employees. Over years, it appeared that the whites got most of the promotions to line supervisory positions.

These events, however, cannot be considered in deciding whether Daniel has produced sufficient evidence of a continuing violation in the form of a racially hostile work environment. The Eleventh Circuit has said:

> To succeed at trial with her hostile environment claim [the plaintiff] must demonstrate that the actions of the defendants altered the condition of the workplace, creating an objectively abusive and hostile atmosphere. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 20-21, 114 S. Ct. 367, 370-71, 126 L. Ed. 2d 295 (1993) ("When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated.") (internal citations omitted). For example, the racial slurs allegedly spoken by co-workers had to be so "commonplace, overt and denigrating that they created an atmosphere charged with racial hostility." *EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067, 1068 (11th Cir. 1990).

*Edwards v. Wallace Community College,* 49 F.3d 1517, 1521 (11th Cir. 1995). There is nothing in the statements of Daniel's former co-workers that suggests that the plaintiff was aware of those things the affiants claimed to have observed and heard. They could not have contributed to his subjective view of a hostile environment. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 20, 114 S. Ct. 367, 370, 126 L. Ed. 2d 295 (1993) (the plaintiff must subjectively view the conduct as hostile). *Edwards* 49 F.3d at 1522.

The purported "KKK" posters, "KKK napkin hoods," and "white cloth . . . with the eyes cut out" clearly relate to the same kind of discrimination. But the court notes the last of these incidents took place in March 1992, one and one-half years before Daniel's discharge. Certainly, allegations that employees were allowed to display "KKK" posters could form part of a pattern of racial harassment. These, however, were present for a very

---

(Daniel's Summary Judgment. Resp. Exh. 25).

32

short time only and that was more than six years before Daniel filed his EEOC charge. Similarly, sending the plaintiff napkins formed to suggest "KKK" masks could likewise constitute racial harassment. But the last of these was in 1991 or 1992.

While one might reasonably, though not necessarily, view them as creating a pattern, none of them occurred within 180 days of Daniel's EEOC charge.

It is not at all clear that the alleged racially tinged comments on the bulletin board were that at all. One reasonable interpretation of the note is that JVC was responding to an anonymous complaint by denying that it used race considerations in its management decisions. Another interpretation might be the one that Mr. Daniel has chosen–that in responding as it did JVC was saying that black persons were "not dependable and not educated enough to be in management." The important point is that the bulletin board statement was different in kind from the "KKK" posters and napkins, as it was different in kind from the alleged racial slurs.

The court is at a loss at what to make of the claim that JVC did not give its employees free tickets. The plaintiff claims that the defendant gave away free tickets to one or more other movies but there is scant evidence that JVC made a habit of giving movie tickets to its employees but changed that policy only when the movie involved was about a well-known black man who was revered by many Americans, both black and white. It is far from clear that the "Malcolm X" and bulletin board incidents could constitute racial harassment at all. *See Harris*, 510 U.S. at 20-21 (conduct must be "objectively" abusive).

Finally, Mr. Daniel charges that four supervisory employees of JVC, on four separate occasions, made statements containing racial slurs. The testimony concerning one of these,

33

the claimed statement of Mr. Hartley, is based upon hearsay four times removed from the source. Even the plaintiff described it as "a rumor." The other three were statements made by low level supervisory employees in discrete circumstances. Nothing in the evidence suggests any connection or relationship, either between the persons making the slurs or in their purposes. These uses of the word "nigger" by three low level supervisory persons at JVC were isolated and unrelated incidences by persons who should have known better but do not, in and of themselves, nor in combination with the earlier "KKK" incidents, create a continuing act of racial harassment. In short, there is nothing about them to suggest a continuing pattern.

The factor that distinguishes a continuing violation from a series of discrete acts of discrimination is whether the substance of the plaintiff's complaint results from "the present consequence of a one time violation, which does not extend the limitations period, [or] the continuation of that violation into the present, which does." *Knight v. Columbus, Ga.*, 19 F.3d 579, 581 (11th Cir. 1994) *cert. denied*, 513 U.S. 929 (1994).

> Where the employer engaged in a discrete act of discrimination [outside the limitations period], allegations that the discriminatory act continues to adversely affect the employee or that the employer presently refuses to rectify its past violation will not satisfy the [statute of limitations].

*Id.* at 580. At best, the plaintiff here alleges discrete acts of discrimination in combination with one "pattern" of acts that ended more than two years before he filed his suit here.

Mr. Daniel's situation is not unlike that found in *Roberts v. Gadsden Memorial Hosp.*, 835 F.2d 793 (11th Cir. 1988), modified 850 F.2d 1549 (11th Cir. 1988). In *Roberts*, the plaintiff was discriminatorily denied a promotion in 1981 and had filed a timely charge with

34

the EEOC. The Eleventh Circuit affirmed the district court ruling in his favor. *Roberts*, 835

F.2d at 798-99. That court also considered whether Roberts could also recover on a claim

that he was discriminatorily denied a promotion for the same position in 1978. It found he

could not.

[E]ven if we assume that the 1978 discriminatory act continued into the statutory
filing period, we must still conclude that [the plaintiff's] claim based on that incident
is time-barred. [The plaintiff] admitted that he was aware of his rights in 1978. He
could have asserted them at that time. To the extent that [the defendant] injured him
on a continuing basis as a result of the 1978 incident, it was only because he
knowingly failed to exercise his rights. A claim arising out of an injury which is
"continuing" only because a putative plaintiff knowingly fails to seek relief is exactly
the sort of claim that Congress intended to bar by the 180-day limitation period.

*Roberts*, 850 F.2d at 1550. The evidence here is clear that Daniel knew of the Klan-related

incidents that he claims occurred between 1987 and 1992. If he subjectively believed that

he was a victim of discrimination he could have filed an EEOC charge then. He did not do

so until after he was terminated in November 1993.

To the extent, if any, that Daniel was injured by a continuing violation on the part of JVC,

"it was only because he knowingly failed to exercise his rights." *Roberts*, 850 F.2d at 1550.

The "continuing violation doctrine does not exist to give an employee who allowed a

legitimate claim to lapse a second chance to file that claim." *Lewis v. Board of Trustees*

*of Alabama State Univ.*, 874 F. Supp. 1299, 1303 (M.D. Ala. 1995) (discussing *Roberts v.*

*Gadsden Mem. Hosp.*, 835 F.2d 793, 800 (11th Cir. 1988)).

In summary then, the plaintiff has failed to produce sufficient evidence that would

permit a jury to find the existence of a continuing violation. The continuing violation theory

is properly applied only where there is some continuing, recurring wrong that is the result

35

of a continuously applied pattern of discrimination. Daniels' case presents allegations of several discrete acts that he knew were discriminatory as applied to him, yet he failed to do anything about any of them until he was caught trafficking crack cocaine and was discharged.

The court concludes that the plaintiff has not produced sufficient evidence to create a genuine issue of material fact regarding the timeliness of his EEOC charge as to the harassment, promotion, or discipline claims.[17]

Although summary judgment is due to be granted, one final matter should be noted regarding the hostile environment claim. The defendant asserts that it is due summary judgment on the merits of the hostile environment claim because it has established the affirmative defense available to it under *Faragher v. City of Boca Raton*, 1998 U.S. LEXIS 4216 (1998). In *Faragher,* the United States Supreme Court held that an employer will be vicariously liable to an employee who was subjected to an actionable hostile environment if that environment was created by a supervisor. An employer, however, has available to it an affirmative defense if: (1) it exercised reasonable care to prevent and correct promptly

---

[17] As noted earlier, Judge Clemon dismissed Daniel's claims under 42 U.S.C. § 1981 on timeliness grounds and then refused to allow an amendment to return those claims to the complaint. He did that in the face of plaintiff's argument that 28 U.S.C. § 1628 had created a four-year period of limitations for actions brought under § 1981. The court is persuaded that decision was correct and that the two-year period of limitations applied by Judge Clemon is the proper one. *See Lane v. Ogden Entertainment Inc.*, 13 F. Supp. 2d 1261 (M. D. Ala. 1998)(rejecting argument that § 1628 had expanded the limitations period for § 1981 actions.). Moreover, the running of the limitations period was not tolled by the pending EEOC charge. *Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454 95 S. Ct. 1716, 44 L. Ed. 2d 295 (1975).

Because this action was not filed until May 8, 1996, more than two and one-half years after his termination, the plaintiff has alleged no act of discrimination, discrete or continuing, that would be timely under § 1981. There is, then, no occasion to discuss the continuing violation theory as it might have applied to any § 1981 claim, were any such claim still in the case.

36

any harassing behavior; and (2) the employee unreasonably failed to take advantage of any

preventive or corrective measures provided by the employer to prevent harassment.

This argument fails here because there is a genuine issue regarding whether Daniel

took advantage of the remedies available to him under JVC's policy. JVC had a written

antiharassment policy that was communicated to the plaintiff. One section of JVC's

employee handbook, which Daniel acknowledges that he received, provides:

### WORKPLACE HARASSMENT POLICY

JVC attempts to maintain a cooperative and business-like working environment
where each employee is treated with respect and dignity by every other employee.
JVC will not tolerate or condone behavior that may be construed as harassment of
any employee on the basis of any of the protected classifications listed in the Equal
Opportunity Policy.

In particular, JVC prohibits all harassment, which includes, but is not limited to,
verbal harassment (epithets, derogatory statements, slurs), physical harassment
(assault, physical interference with normal work or movement), visual harassment
(posters, cartoons, drawings), and insinuations.

You should be aware that sexual harassment is unlawful and will not be
permitted at JVC. Sexual harassment includes any unwelcome sexual advances,
requests for sexual favors, sexually motivated physical contact and other verbal or
physical conduct or visual forms of harassment of a sexual nature.

If you feel that you have been subjected to harassment, you should immediately
report the matter to your Supervisor. If your Supervisor is the problem, report the
matter to any Supervisor you choose, including any Manager or Personnel. JVC
pledges that no report of harassment will jeopardize your job security or result in
retaliation. Prompt, effective, corrective action will be taken against any individual
found to have engaged in such conduct up to and including termination. For more
information, please refer to JVC's detailed policy statement on harassment.

(Daniel Exh. 31). One might reasonably question whether the policy was effective, based

upon Daniel's claim that he did, in fact, report at least some of the acts he thought

constituted racial harassment and that he received little, if any, relief.

37

The evidence of record is that Daniel stated that he had reported the receipt of the "KKK" items to a number of JVC supervisors: Mark Cole; Keith Gamble; Robert Morris; Mr. Hartley; Bill Rush; and two Japanese managers. (Daniel 122). The plaintiff testified about these incidents in a 1992 deposition when he stated he had "mentioned" them to Robert Morris once in 1991. (Daniel (1992) 122). He also stated he never received any Klan item after complaining to Morris in 1991 and had never complained about them again. (Daniel (1992) 122-23). In an affidavit filed with his summary judgment response, Daniel asserts again that he informed JVC supervisors of these matters.

Because this evidence creates a genuine issue of material fact regarding whether the plaintiff unreasonably failed to take advantage of JVC's antiharassment policy, summary judgment on the hostile environment claim is precluded insofar as the motion is founded upon Daniel's failure to avail himself of the defendant's antiharassment policy. Of course, as noted, the motion is granted on other grounds.

## V. Conclusion.

Based upon the foregoing, there being no genuine issue of material fact, the defendant's motion for summary judgment will be granted on all claims. The action will be dismissed with prejudice and costs will be taxed against the plaintiff and in favor of the defendant. A separate order will be entered.

Done, this _____ day of July 1999.


_____
Edwin Nelson
United States District Judge

39